USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 1/22/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RALPH BRANNON,

                    Plaintiff,

          v.

DELTA AIRLINES, INC. REBECCA
BERNANDIN, CORIE NICHOLS POSIE, AND
THE PORT AUTHORITY OF THE STATE OF
NEW YORK AND NEW JERSEY,

                    Defendants.

---

No. 17-CV-6024 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

This action arises out of an altercation between Plaintiff Ralph Brannon and several flight attendants on an August 11, 2016 Delta Airlines flight from Orlando, Florida to New York. Plaintiff, an attorney proceeding *pro se*,[1] filed the action against Delta Airlines, Inc., Delta flight attendants Rebecca Bernardin and Corie Nichole Posey, and the Port Authority of New York and New Jersey, asserting claims for unlawful racial discrimination under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, excessive force under 42 U.S.C. § 1983, as well as various state law claims.[2] Defendants Delta, Bernardin, and Posey (collectively, the "Delta Defendants") and

---

[1] *See* Pl. Opp'n, Dkt. 131, at 4, 19; Pl. Ltr., Dkt. 148, at 1, 4; Delta Mot. Ex. B, Pl. Depo. Tr. ("Pl. Tr."), at 11-12, 20-21, 71, 239-240.

[2] In his complaint, Plaintiff also states that he "seeks a declaration and injunctive relief by declaring the Port Authority of the State of New York/New Jersey in violation of the Freedom of Information Act by concealing information on witnesses that may be favorable to plaintiff." Compl. ¶ 1. As an initial matter, however, "[t]he Freedom of Information Act ('FOIA'), 5 U.S.C. § 552, applies to the federal government only and not to municipal or state agencies." *Gianello v. Port Auth. of N.Y. & N.J.*, No. 11 Civ. 3829 (JGK), 2011 WL 2436674, at *1 (S.D.N.Y. June 16, 2011); *see also Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 484 (2d Cir. 1999) ("[I]t is beyond question that FOIA applies only to federal and not to state agencies.") (citations omitted). Moreover, both Magistrate Judge Pitman and this Court have already addressed Plaintiff's speculative claim that certain passengers left written statements with the Port

Defendant the Port Authority have each moved for summary judgment. For the reasons set forth below, Defendants' motions are granted as to Plaintiff's federal claims, and the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

## BACKGROUND[3]

On August 11, 2016, Plaintiff traveled on Delta Flight 494 from Orlando, Florida to LaGuardia Airport in New York using a "Buddy Pass" that he received through his friend Steven Greenidge, a Delta employee. Delta 56.1 ¶¶ 1-2, 6. A "Buddy Pass" is a "benefit given to Delta employees, which allows a family member or friend of an employee to fly standby on Delta flights." *Id.* ¶ 4. By using the Buddy Pass, Plaintiff was flying as a "non-revenue passenger," meaning that the did not pay for the flight. *Id.* ¶ 2.[4]

During the boarding process, Plaintiff asked Rebecca Bernardin, the lead flight attendant

---

Authority after the incident, *see* Dkt. 92, 101, 134, and his request for an order directing that the Port Authority "provide all information connected with this alleged incident," Compl. ¶ 59, is thus denied.

[3] Because Plaintiff did not file a Rule 56.1 Statement, the following facts are drawn primarily from the Rule 56.1 statements submitted by the Delta Defendants ("Delta 56.1"), Dkt. 113, and the Port Authority ("PA 56.1"), Dkt. 119, as well as the exhibits filed with Defendants' summary judgment motions, and are generally deemed to be admitted. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); *see also* Dkt. 115 (Delta Defendants' Rule 56.2 Notice sent to Plaintiff); Dkt. 120 (Defendant Port Authority's Rule 56.2 Notice sent to Plaintiff). Not only is Plaintiff not entitled to the "special solicitude" typically afforded *pro se* parties because he is an attorney, *see Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010), but *pro se* litigants are not exempt from complying with the local rules. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006). If Plaintiff sought to provide his own version of the events or dispute the facts at issue, it was his obligation to do so in accordance with the Local Rules. In fact, Plaintiff should be well aware of the consequences of failing to file his own Rule 56.1 statement on a motion for summary judgment. When deciding a summary judgment motion in another case that he filed, *Brannon v. City of New York*, Nos. 09-CV-4335-LTS, 11-CV-3378-LTS, 2016 WL 270399 (S.D.N.Y. Jan. 21, 2016), Judge Swain concluded that, since Plaintiff had "failed to provide his own Rule 56.1 statement in response" to the defendant's, the facts proffered by the defendant were deemed to be admitted. 2016 WL 270399, at *4. This is also consistent with the Local Rule, which provides that facts in a party's Rule 56.1 statement that are supported by testimonial or documentary evidence, and denied only by way of a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, are deemed to be true. *See* S.D.N.Y. Local Rule 56.1(c)-(d). In any event, the Court has conducted its own review of the record, including Plaintiff's deposition transcript, to make the factual and legal conclusions discussed in this Opinion.

[4] Plaintiff claims that he was a paying passenger, but his deposition testimony makes clear that he did not in fact pay for the flight from Orlando to New York, other than possibly giving his friend, Mr. Greenidge, $5 or $10. *See* Pl. Tr. at 24, 83, 96-97.

on Delta Flight 494, about the benefits of the "Comfort Plus" area in which he was sitting. *Id.* ¶¶ 8, 30. After checking the flight's manifest and realizing that no one had been assigned to the seat Plaintiff was sitting in, another flight attendant, Lindsay Grant, approached him and asked to see his boarding pass. *Id.* ¶¶ 9-10. Plaintiff complied, and Grant confirmed that he was sitting in the correct seat. *Id.* ¶ 11. Prior to take off, Plaintiff approached the flight attendants in the "front galley area" and asked for water, which he was given. *Id.* ¶ 12. He also requested a Coke, but at the moment he did so, the pilot announced that the aircraft was about to take off. *Id.* ¶¶ 13-14. Bernardin told Plaintiff they would provide his Coke during the drink service, and Plaintiff returned to his seat for take-off. *Id.* ¶¶ 14-15.

During the in-flight drink service, Grant approached Plaintiff and asked for his drink order. *Id.* ¶ 17. Plaintiff asked whether individuals seated in a "Comfort Plus" seat were entitled to a free alcoholic beverage, and after being told that they were, ordered a vodka cranberry. *Id.* ¶¶ 18-19. As Grant began making the vodka cranberry, Plaintiff also asked for the Coke he had requested before take-off. *Id.* ¶ 20. Grant thought Plaintiff had changed his mind about the vodka cranberry, and poured him a Coke instead. *Id.* ¶ 21. When she handed Plaintiff the Coke, he again asked for the vodka cranberry, which confused Grant. *Id.* ¶ 22. The Delta Defendants assert that Plaintiff then "rudely demanded" that he wanted a "vodka cran" and a Coke, and asked "how difficult is that to understand?" *Id.* ¶ 23. At this point, Grant realized that Plaintiff was "the non-revenue passenger who asked for the Coke on the ground," and subsequently "crouched down" in order to speak to [him] more privately. *Id.* ¶ 24. According to the Delta Defendants, Grant reminded Plaintiff that because he was a non-revenue passenger, he was obligated to follow the Delta Pass Travel Dress Code, Etiquette, and Conduct ("Code of Conduct"), and as such, "was not to be

disrespectful to the flight crew." *Id.* ¶ 25.[5] The Delta Defendants assert that Plaintiff then "began loudly arguing" with Grant and "falsely asserting that she was being rude to him." *Id.* ¶ 28. They further maintain that Grant then removed herself from the interaction. *Id.* As she was returning up the aisle after concluding the drink service, however, Grant overheard Plaintiff "complaining to the couple across the aisle about the rude service he received from the flight attendants." *Id.* ¶ 29. Grant returned to the front galley of the aircraft and informed Bernardin of her interaction with Plaintiff. *Id.* ¶ 30.

Shortly thereafter, Plaintiff went to use the lavatory in the front of the aircraft. *Id.* ¶ 32. Because the lavatory was occupied and another person was waiting to use it, Bernardin advised Plaintiff that there were two available lavatories in the back of the aircraft. *Id.* ¶¶ 32-33. According to the Delta Defendants, Plaintiff "appeared offended" by that "suggestion," but did not say anything in particular, and returned to his seat. *Id.* ¶ 34.

At another point in the flight, Corie Nichole Posey, a third flight attendant, passed Plaintiff's row and overheard him "voicing his displeasure with the flight attendants and Delta to other passengers seated near him." *Id.* ¶ 35.[6] Posey informed Bernardin of Plaintiff's behavior when she returned to the front galley. *Id.* ¶ 40.

Bernardin subsequently approached Plaintiff and asked him to accompany her to the front galley for "a private word." *Id.* ¶ 41. According to the Delta Defendants, once at the front of the aircraft, Bernardin—standing with Grant and Posey—apologized to Plaintiff for any

---

[5] Individuals who travel pursuant to a Buddy Pass are subject to certain "restrictions," including the Code of Conduct, which is "a set of rules Delta provides to its employees who receive and share their Buddy Passes." *Id.* ¶¶ 5, 26.

[6] The Delta Defendants also assert that, at some point during the flight, a commuting Delta captain approached the flight attendants regarding Plaintiff's behavior. *Id.* ¶ 37. In particular, Delta Captain Robert Robbins, who was commuting on Flight 494, "observed Plaintiff complaining about the [flight attendants] to passengers across the aisle from him in an animated manner, riling up the passengers around him." *Id.* ¶¶ 38-39.

misunderstanding, and asked him to, in accordance with the Code of Conduct, "refrain from commenting negatively about Delta or the [flight attendants] to other passengers." *Id.* ¶¶ 42-43. She also told Plaintiff that if he had any issues, he could address them with her. *Id.* ¶ 44. All three flight attendants assert that the "only reason Plaintiff was approached and asked to come to the front of the cabin" was because he was "a Buddy Pass rider" and was acting in contravention of the Code of Conduct. *Id.* ¶ 45. According to the Delta Defendants, Plaintiff then "pointed" at Bernardin, "loudly stated" that he would not talk to her until the flight had landed, and "loudly exclaimed that the flight attendants were trying to make him out to be a 'terrorist'"[7] while walking back to his seat, which made other passengers "visibly uncomfortable." *Id.* ¶¶ 46-47.

Because the flight attendants became concerned that "things could escalate further," they informed the flight's Captain, Captain Tiedt, of "the disruptive passenger on board." *Id.* ¶ 51. As a result, Captain Tiedt "radioed in" the issue and discussed it with Delta corporate security on the ground in Atlanta. *Id.* ¶ 52. Captain Tiedt also "made the precautionary decision to lock down the cockpit and have the aircraft met by a Delta supervisor and the police" upon landing. *Id.* ¶ 53.

At approximately 3:06 p.m., four Port Authority police officers at LaGuardia Airport received a radio call about a "disruptive passenger" aboard Flight 494. PA 56.1 ¶ 1. Upon receiving the call, the officers proceeded to the relevant gate at LaGuardia Airport and waited for Flight 494 to arrive. *Id.* ¶ 4. Once the flight landed, Captain Tiedt contacted Delta operations and was informed that the Port Authority would be meeting the aircraft at the gate. Delta 56.1 ¶ 55. Although the call that the Port Authority officers received erroneously stated that the allegedly

---

[7] During his deposition, Plaintiff first stated that, on his way home from LaGuardia Airport, he had received a call from Mr. Greenidge, who had told him that Plaintiff had been designated a "level-one terrorist." *See* Delta 56.1 ¶ 49; Pl. Tr. at 31. Later in the deposition, however, Plaintiff admitted that Mr. Greenridge had said that he had been designated a "level-one *threat*." *See* Delta 56.1 ¶ 50; Pl. Tr. at 86, 93-95, 207-210.

disruptive passenger had been "zip tied abroad the plane and was under a seat," PA 56.1 ¶ 3, when he spoke to the officers, Captain Tiedt informed them that Plaintiff "was not restrained and had not been physically violent." Delta 56.1 ¶¶ 57-58. Captain Tiedt asked the officers if they wanted to come on board to speak with Plaintiff or if they wanted the Captain to identify Plaintiff as he deplaned with the rest of the passengers. *Id.* ¶ 61. In response, the Port Authority informed Captain Tiedt that they would board the aircraft to escort Plaintiff off the plane before general disembarking by the other passengers. *Id.* ¶ 62.

Two Port Authority officers, Officer Samantha Morris and supervisor Sergeant Regina Womack, then entered the plane and proceeded to Plaintiff's seat in a "non-threatening" manner, "with their service weapons holstered and [their] batons . . . secured in their belts." PA 56.1 ¶¶ 6-8. Sergeant Womack, without "rais[ing] her voice or threaten[ing] Plaintiff in any way," asked Plaintiff to exit the aircraft so they could speak with him in the terminal, and Plaintiff "voluntarily" did so. *Id.* ¶¶ 9-10. As other passengers were disembarking, several noted to the flight's co-pilot, First Officer Velsor, who was standing at the door, "that the flight attendants did an outstanding job dealing with Plaintiff." Delta 56.1 ¶ 64.

In the airport terminal, the Port Authority officers interviewed Plaintiff for about 15 to 20 minutes. PA 56.1 ¶ 12. The officers did not "raise their voices or make any verbal statements that would indicate to Plaintiff that he was under arrest or otherwise being detained," *id.* ¶ 13, nor did they place handcuffs on Plaintiff or physically touch him, *id.* ¶ 15. Indeed, Plaintiff testified at his deposition that he did not feel restrained or intimidated by the Port Authority officers during their interaction. *Id.* ¶ 14. Rather, he spoke to the officers "voluntarily" to provide his own narrative about what had happened on the flight. *Id.* ¶ 17. As he was being interviewed, the flight attendants from Flight 494 walked by, and Plaintiff shouted at Grant, calling her an "evil bitch." Delta 56.1

¶ 65.

After Plaintiff was escorted off the plane, the Port Authority also interviewed "all involved." *Id.* ¶ 63. The officers ultimately determined that "nothing criminal" had occurred on the flight, told Plaintiff that he was "not under arrest or in any legal trouble," and concluded the interview. PA 56.1 ¶¶ 18-19. The Port Authority allowed Plaintiff to leave the airport without being arrested. Delta 56.1 ¶ 66. Morris subsequently prepared a "non-criminal incident report," which concluded that "there was no [interference] with the flight crew." PA 56.1 ¶ 20.

Although he did not submit his own statement of facts or respond to either Rule 56.1 statement filed by Defendants, Plaintiff claims that all of the Delta Defendants' actions on Flight 494 were motived by racial animus. *See, e.g.*, Pl. Opp'n, Dkt. 131, at 15, 17-18; Compl. ¶¶ 1, 5. Plaintiff also asserts that the Port Authority acted based on the allegedly discriminatory information that they received from the Delta Defendants, and thereafter subjected him to "excessive force" in their response. *See, e.g.*, Compl. ¶ 57. In particular, Plaintiff claims that he was subjected to a "show of force" when, upon landing at LaGuardia Airport, several Port Authority officers boarded the aircraft and escorted Plaintiff off of the plane. *See, e.g.*, Pl. Tr. at 165, 181. Notably, however, he never claims that any of the Delta Defendants made any statements bearing on race in any way, or that any of the Port Authority officers ever even touched him.

## PROCEDURAL HISTORY

Plaintiff filed this action on August 9, 2017, alleging claims for discrimination and excessive force under various federal statutes. Dkt. 1. On August 15, 2017, Plaintiff filed an amended complaint, which is the operative complaint in this action. *See* Dkt. 3.[8] The Port

---

[8] During his deposition, Plaintiff explained that the only difference between his initial complaint and the operative amended complaint is that, in the latter, he asserted that this Court's subject matter jurisdiction is based on diversity jurisdiction. *See* Pl. Tr. at 88-89. Notwithstanding Plaintiff's claim that this Court has jurisdiction under 28 U.S.C. §

Authority answered on December 22, 2017, Dkt. 9, and Delta answered on January 3, 2018, Dkt. 11. When the Port Authority answered the complaint, it also asserted a cross-claim against Delta, *see* Dkt. 9, which Delta answered on June 22, 2018, *see* Dkt. 41.[9]

The Delta Defendants and the Port Authority each separately moved for summary judgment on August 9, 2019. *See* Dkts. 111, 117. On August 21, 2019, Plaintiff filed an opposition to the Delta Defendants' motion. *See* Dkts. 131, 135.[10] The Delta Defendants replied on September 10, 2019. Dkt. 138. Having not received any opposition from Plaintiff in response to the Port Authority's summary judgment motion, on December 2, 2019, the Court ordered Plaintiff to file, by December 23, 2019, either a response to the Port Authority's motion or a letter indicating that he does not intend to file a response but nonetheless seeks to pursue this action against the Port Authority. *See* Dkt. 147. On December 23, 2019, Plaintiff filed a letter that largely reiterates the allegations in his complaint and arguments in his opposition to the Delta Defendants' motion. Dkt. 148. He also filed a virtually identical "amended" version of that same letter on January 2, 2020. *See* Dkt. 149. The Port Authority filed a reply on January 6, 2020. Dkt. 150.[11]

---

1332, *see* Compl. ¶ 2, the Court finds that there is no diversity jurisdiction in this action. There is no diversity of citizenship between the parties because Plaintiff is a citizen of New York, *see* Pl. Tr. at 4, 212, and for diversity jurisdiction purposes, the Port Authority is a citizen of both New York and New Jersey. *See Donnelly v. Port Auth. of N.Y. & N.J.*, No. 93 Civ. 4668 (CSH), 1994 WL 319365, at *1 (S.D.N.Y. June 28, 1994) ("According to § 1332(c), the Port Authority is a citizen of both New York and New Jersey."); *see also Costa v. Port Auth. of N.Y. & N.J.*, No. 95 Civ. 4749 (CSH), 1996 WL 143908, at *3 (S.D.N.Y. Mar. 29, 1996) (finding that, where plaintiff is a New York resident and "the Port Authority is regarded as citizen of both New Jersey and New York," the "presence of the Port Authority destroys complete diversity of citizenship and deprives this Court of subject matter jurisdiction").

[9] Defendants Bernardin and Posey also filed separate answers to Plaintiff's complaint on June 22, 2018. Dkts. 39, 40.

[10] Dkt. 131 is missing page 16. A single page 16 was filed as a separate document on August 27, 2019. *See* Dkt. 135.

[11] On September 25, 2019, Plaintiff also filed a letter entitled "Request Leave to File Second Amended Complaint Pursuant to the Airline Deregulation Act (ADA)," Dkt. 142, to which the Delta Defendants responded on September 30, 2019, Dkt. 143. Plaintiff does not explain what he seeks to amend, or provide any reasoning as to why leave to amend would not be futile or result in prejudice to Defendants. Because Plaintiff's September 25th letter also does not raise any "new issues which are material to the disposition of the question before the court," the Court will disregard it. *See Mohsen v. Morgan Stanley & Co.*, No. 11 Civ. 6751 (PGG), 2013 WL 5312525, at *3 n.2 (S.D.N.Y. Sept. 23, 2013); *United States v. Int'l Bus. Machs. Corp.*, 66 F.R.D. 383, 384 (S.D.N.Y. 1975). The same is true for his January 10, 2020 letter, *see* Dkt. 151, to which the Delta Defendants replied on January 14, 2020, *see* Dkt. 152. In

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted). In deciding such a motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).

Moreover, "[i]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants, particularly where motions for summary judgment are concerned." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (per curiam) (citation and alteration omitted). Thus, "[c]ourts read the pleadings, briefs, and opposition papers of pro se litigants 'liberally and interpret them to raise the strongest arguments that they suggest.'" *Rivera v. Goulart*, No. 15-CV-2197 (VSB), 2018 WL 4609106, at *3 (S.D.N.Y. Sept. 25, 2018) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). However, "*pro se* attorneys . . . typically 'cannot claim the special consideration which the courts customarily grant to *pro se* parties.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) (quoting *Harbulak v. Cty. of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)); *see also Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) (noting that "a lawyer representing himself ordinarily receives no such solicitude at all") (collecting cases).

---

any event, even if the Court were to consider the arguments asserted in these letters, it would not change the Court's conclusions.

Accordingly, Plaintiff is not entitled to the "special solicitude" typically afforded *pro se* parties. *See Sullivan v. City of New York*, No. 14-CV-1334 (JMF), 2016 WL 3198303, at *3 (S.D.N.Y. June 8, 2016); *Stern v. Regency Towers, LLC*, 886 F. Supp. 2d 317, 322 (S.D.N.Y. 2012); *Corsini v. Ross*, No. 97-CV-0968 (JGK), 1997 WL 539950, at *3 (S.D.N.Y. Aug. 28, 1997).

## DISCUSSION

### I.     Race Discrimination Claims Against the Delta Defendants

#### A. Section 1981

The Delta Defendants contend that they are entitled to summary judgment on Plaintiff's Section 1981 claim because he has failed to present facts that give rise to "even a plausible inference of racially discriminatory intent involving the conduct of the Delta Defendants." Delta Mot. at 10. The Court agrees.

To prevail on his claim under 42 U.S.C. § 1981, Plaintiff must show: (1) that he is a member of a racial minority; (2) that the Delta Defendants intended to discriminate against him on the basis of race; and (3) "discrimination concerning one of the statute's enumerated activities," i.e., "the rights 'to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property.'" *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000) (quoting 42 U.S.C. § 1981(a)); *see also Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 68 (2d Cir. 2015) ("To state a discrimination claim under . . . § 1981, plaintiffs must sufficiently allege that defendants acted with discriminatory intent").

Where a plaintiff pleads intentional racial discrimination, he "must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent," and may not rely on "naked assertions" of discrimination. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713-14 (2d Cir. 1994); *see also Shin v.*

10

*American Airlines Grp., Inc.*, No. 17-CV-2234-ARR-JO, 2017 WL 3316129, at *3 (E.D.N.Y. Aug. 3, 2017) ("'[B]are allegations' [of discrimination] without 'provid[ing] meaningful specifics' do not 'give rise to an inference of unlawful discrimination.'") (quoting *Burgis*, 798 F.3d at 68-69); *Bary v. Delta Airlines, Inc.*, No. 02-CV-5202 (DGT), 2009 WL 3260499, at *8 (E.D.N.Y. Oct. 9, 2009) ("Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated.") (quoting *Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir. 1988) (en banc)). A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *See Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 244 (S.D.N.Y. 2014) (citation omitted).

Pursuant to the familiar framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Plaintiff must first meet the initial burden of pleading a prima facie case of discrimination. *See Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013) (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n.3 (2003)). Once Plaintiff establishes a prima facie case, the burden shifts to the Delta Defendants to set forth "a legitimate, nondiscriminatory reason" for their actions. *See id.* If the Delta Defendants do so, then the burden shifts back to Plaintiff to demonstrate that "the reasons offered by [the Delta Defendants] are pre-textual and that [their] action was actually motivated by race." *Bary*, 2009 WL 3260499, at *9 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Plaintiff fails to meet even his initial burden of proving a prima facie case of discrimination because he does not present any evidence—direct or circumstantial—that the Delta Defendants intentionally discriminated against him on the basis of his race. Rather, Plaintiff relies on pure speculation and conjecture to assert that, because he is an African-American man, the flight attendants' actions in response to his behavior must have been motivated by their discriminatory

biases against African Americans. *See, e.g.*, Compl. ¶ 1 (alleging that the flight attendants "personally cast [him] in a false light in that the image of a black man being detained reinforces stereotypes and reinforces bias and prejudice against people of African heritage on the basis of race"); Pl. Opp'n, Dkt. 131, at 17 (arguing that there is "proof of a racial animus" because the flight attendants "are fully aware of the societal stereotypes that pervade in this country . . . that gives them a 'leg up' on any controversy involving an African-American"); *id.* at 18 ("Using my color as a scapegoat. Plaintiff knows that 'living while black' carries baggage."). Although he alleges that the flight attendants made "racist and defamatory statements," Compl. ¶ 5, he does not identify any such specific statements or by whom they were allegedly made. Plaintiff also does not allege how *any* statements made by the Delta Defendants could be viewed as proof of intentional discrimination. *See Tejwani v. United Airlines, Inc.*, No. 08 Civ. 2966 (SCR), 2009 WL 860064, at *3 (S.D.N.Y. Mar. 31, 2009) (dismissing discrimination claims under Section 1981 and Title VI where plaintiff failed to allege "any derogatory remarks or comments" or any "preferential or non-discriminatory treatment to *any* similarly-situated non-minority passengers," and where instead, plaintiff "simply allege[d], in conclusory fashion," that certain individuals "conspired" to "violate [his] civil rights"). Nor does Plaintiff allege any specific actions on the part of the Delta Defendants that could allow for an inference of racial animus. *See Shin*, 2017 WL 3316129, at *3 (dismissing Section 1981 claim where, "[o]ther than the bare allegation that whites were allowed to board the flight, the complaint [was] completely devoid of details suggesting intentional discrimination"). Plaintiff's contention that the Delta Defendants attempted "to incite/excite [him] into loud or conspicuous behavior to create attention towards a tall black man . . . to cause negative attention and get [him] in trouble," *id.* ¶ 50, is purely speculative. And his assertion that the flight attendants used "the words 'racist' and 'racism,'" Pl. Opp'n, Dkt. 131,

12

at 17, is both unsupported by the record and insufficient to maintain his claim.[12]  Putting aside the

statement in the Port Authority's Non-Criminal Incident Report that Posey overheard *Plaintiff* say

that the flight attendants were racist, *see* Delta Mot. Ex. L at 2, there is no evidence that the Delta

Defendants themselves used the word "racist" or that they made any statements otherwise

indicative of racial animus.

The arguments asserted in Plaintiff's opposition brief are similarly speculative.  Plaintiff

seems to argue that he has met his burden on his discrimination claim because (1) the flight

attendants "published/printed false and defamatory and libelous statements," which were "totally

untrue and can be viewed [as] reflecting a racial animus," (2) other passengers around him

purportedly noted that the flight attendants "were racist," and (3) because, Plaintiff claims, the

flight attendants believed "that the negative image of Black Americans would buttress there [sic]

lies" and that "their whiteness would give them instant credibility over a racial minority."  Pl.

Opp'n, Dkt. 131, at 15.  But again, Plaintiff offers no evidence to support these arguments,

especially since he does not point to any specific statements or conduct that could be viewed as

being motivated by his race, as opposed to by his disruptive behavior on the flight.

Plaintiff's deposition testimony confirms that his race discrimination claim is not based on

any actual statements that the Delta Defendants made or any conduct in which they engaged.

---

[12] This argument is especially perplexing because, elsewhere in his opposition, Plaintiff indicates that the words "racist" or "racism" were not used. *See, e.g.*, Pl. Opp'n, Dkt. 131, at 12 ("F/O Jessop did not hear any mention of terrorist or racism."); *id.* at 14 ("Captain Robbins states no racial or terrorist comments were made at all.").  Plaintiff also repeatedly suggests that the flight attendants somehow "put" those "untrue" words in his own mouth, and that their doing so—i.e., making *Plaintiff* use the words "racist" and "racism"—is what constituted intentional discrimination. *See, e.g.*, Pl. Opp'n, Dkt. 131, at 20 ("The flight attendants [sic] false INTERJECTION of the word 'racist' coming out allegedly from of [sic] plaintiff's mouth 'opened the door' for Plaintiff's claims of intentional discrimination."); Pl. Opp'n, Dkt. 135, at 16 (arguing that the flight attendants' "putting untrue libelous statements of 'racist' [and] 'racism' . . . in Plaintiff's mouth indicate a prima facie evidence of a racially motivated intent").  But Plaintiff cannot sustain his discrimination claim by asserting that he himself stated that the flight attendants were racist or were "making him out to be a terrorist."  In short, he fails to assert any arguably racist statement that was made by any of the flight attendants.

When asked about the basis of his Section 1981 claim, for instance, Plaintiff responded that it was based on the fact that he was deemed "a level-one threat." Pl. Tr. at 94-95. As an initial matter, there is no evidence in the record that any of the Delta Defendants ever told Plaintiff that he was a "level-one threat." Rather, Plaintiff received that information from his friend Mr. Greenidge, *see id.* at 86, and Plaintiff admitted that Mr. Greenidge did not provide him with any internal Delta documents indicating that he was in fact considered a "level-one threat," *id.* at 232-233. Although the evidence does not establish that any Delta employee—other than perhaps Mr. Greenidge— ever labeled Plaintiff a "level-one threat," even if it did, there is nothing inherently discriminatory about that classification.

Plaintiff's testimony also confirms that his claim is based solely on his own speculation and suspicion with respect to what others think of him, and African-American men more generally. For instance, when asked about what happened when he was approached by one of the flight attendants, Plaintiff testified, "When you're black in America, there's just something about it. You just assume something is going to happen." Pl. Tr. at 48. And when asked about the events that followed the Port Authority's entry onto the plane, he explained, "Here, I'm getting off a plane and Port Authority police and all these passengers, they don't know what happened. Another black guy in trouble. Don't tell me it don't happen. You see this in the newspaper. I admit we commit a disproportionate amount of crime, and we're to blame, but every black person is not a bad person." *Id.* at 93. At other points during his deposition, Plaintiff testified that he "purposely [does not] raise [his] voice because of being a black man. They think we're going to do something crazy," *id.* at 62, and that there were no further interactions once he sat back down after speaking with the flight attendants in the front galley because "they"—presumably referring to the Delta Defendants—"already called [the Port Authority] and said probably we got some black guy on the

14

plane who's a terrorist." *Id.* at 52. Other than his own speculation, however, there is simply nothing in the record to support these bald assertions.

Moreover, although an inference of discrimination may be established by demonstrating that similarly situated individuals were treated more favorably, Plaintiff also fails to state a discrimination claim based on this theory. The Delta Defendants assert that there were "a number of commuting Delta employees and Buddy Pass riders traveling as non-revenue passengers" on Flight 494, but that Plaintiff does not allege that he was treated differently than any of these other similarly situated "non-revenue passenger[s]." Delta Mot. at 13. In his opposition, Plaintiff appears to argue that other passengers were given "preferential treatment" in part due to "the racial bias towards" Plaintiff. Pl. Opp'n, Dkt. 135, at 16. He does not, however, show how any of the other passengers were similarly situated to him—such as by providing specifics about their races —or how their treatment differed from his, or set forth other evidence to support an inference of racial discrimination based on treatment of similarly situated individuals. Plaintiff cannot maintain his discrimination claim based on an unsupported assertion regarding how similarly situated individuals were treated. *See Dennis v. Delta Air Lines, Inc.*, No. 10-CV-973 (DLI) (LB), 2011 WL 4543487, at *4 (E.D.N.Y. Sept. 29, 2011) ("Plaintiff has failed to demonstrate an inference of race-based discrimination because Plaintiff has not provided proof that any similarly situated individuals of another race were treated differently."); *see also id.* ("Plaintiff cannot rely on conclusory allegations, . . . but must bring factual allegations showing otherwise."); *Bary*, 2009 WL 3260499, at *9 (explaining that, where a plaintiff supports an inference of race discrimination by "demonstrating that similarly situated [individuals] of a different race were treated more favorably," the plaintiff should also show that there is "a reasonably close resemblance of facts and circumstances") (quoting *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999)

and *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001)). His conclusory allegations and unsupported arguments are thus insufficient to establish a prima facie case of intentional discrimination.

Even assuming, *arguendo*, that Plaintiff could establish a prima facie case, the Delta Defendants would nonetheless be entitled to summary judgment because they have articulated a legitimate, non-discriminatory reason for their actions. The Court agrees with the Delta Defendants that the record establishes that the reason the flight attendants "engaged [Plaintiff] in the first place" is because of his "unruly and disruptive behavior while being a Buddy Pass rider in contravention of Delta's Buddy pass Code of Conduct," Delta Mot. at 13—and that Plaintiff has not shown that this reason is pretextual. *See Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335-36 (2d Cir. 1997), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000) ("Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case."); *Dennis*, 2011 WL 4543487, at *5 (noting that, "[w]ith respect to pretext, 'the question is . . . whether the stated reason *was* [the defendant's] reason: not a good reason, but the true reason") (quoting *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006)); *Bary*, 2009 WL 3260499, at *10 ("[A]ll defendant had to do was bring forth some legitimate, non-discriminatory explanation for its conduct.").

In response to their assertion, Plaintiff argues that the Delta Defendants "cannot demonstrate a non-discriminatory reason for the falsehood encompassed in their statements," although he does not explain why that is so or offer any evidence to support a finding of pretext. *See* Pl. Opp'n, Dkt. 135, at 16.[13] Contrary to Plaintiff's contention, the deposition testimony and

---

[13] While asserting that "Delta has not offered true legitimate, and non discriminatory reasons for its actions," Plaintiff does not actually address Delta's asserted legitimate, non-discriminatory reason in his opposition, *see* Pl. Opp'n, Dkt. 131, at 17, and has not otherwise offered any evidence that could sustain his burden.

contemporaneous witness statements confirm that "Plaintiff's unruly and disruptive behavior while being a Buddy Pass rider" is what caused the Delta Defendants to act in the ways that they did—not anything to do with his race. *See, e.g.*, Delta Mot. Ex. D (Grant Tr.) at 139 (explaining that the flight attendants "felt that [they] needed to get the pilots involved" because Plaintiff "was using words that made [them] feel uncomfortable and unsafe, and [they] didn't want the passengers to overhear them and . . . become upset"); *id.* at 153 (explaining that she believed Plaintiff had violated a provision of the Code of Conduct, and had bent down to speak to him during the drink service and asked him to come up to the front galley to "relay the information that's contained in the code and etiquette"); *id.* Ex. F (Bernardin Tr.) at 53-54 (stating that she "informed the pilots that [she] felt uncomfortable speaking with [Plaintiff] after [their] conversation in the forward galley" because Plaintiff "said that [they] were going to make [him] out to be some kind of racist or terrorist"); *id.* at 122 (stating that the reason she decided to have a conversation with Plaintiff in the front galley was "because of the fact that he was a non-revenue passenger flying on another Delta employee's buddy pass"); *id.* Ex. H (Posey Tr.) at 148-49 (explaining that the only reason the flight attendants engaged Plaintiff was because he was "being inappropriate about his [buddy] pass[]"); *see also, e.g., id.* Ex. C (Tiedt Cert.) ¶ 6 ("Due to the non-revenue passenger's continued abusive behavior toward the flight crew and my concern for the safety of the passengers, crew and flight, I contacted dispatch and asked for a company representative and the police to meet us upon arrival at LaGuardia Airport."); *id.* Ex. K (Robbins Tr.) at 69-73 (stating that he remembers Plaintiff making "complaints to other passengers" in a "rather animated" way, particularly about the flight attendants); *id.* Ex. M (Velsor Cert.) at Ex. 1 ("As we deplaned several passengers told me that the flight attendants did an outstanding job dealing with the passenger.").

The Court finds that the evidence submitted in support of the Delta Defendants' motion

confirms that their actions on Flight 494 were based solely on legitimate and non-discriminatory reasons. *See Tejwani*, 2009 WL 860064, at *4 ("'[T]he abundance of other possible reasons' for [the alleged discrimination], 'combined with the lack of any specific factual support for [plaintiff's] claim of racial motivation[,] illustrates that his claim here is simply a naked allegation of racial discrimination.'") (quoting *Yusuf*, 35 F.3d at 714). Accordingly, the Delta Defendants' motion for summary judgment is granted as to Plaintiff's Section 1981 claim.

## B. Title VI

The Delta Defendants are also entitled to summary judgment on Plaintiff's discrimination claim under Title VI.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To prevail on his claim under Title VI, Plaintiff must show that: (1) Delta "received federal financial assistance," (2) Plaintiff "was an intended beneficiary of the program or activity receiving the assistance," and (3) the Delta Defendants "discriminated against [Plaintiff] on the basis of race, color, or national origin *in connection with that program or activity*." *Shin*, 2017 WL 3316129, at *2 (citation omitted).

As an initial matter, Plaintiff has not established that the Delta Defendants discriminated against him on the basis of his race, as required, for the same reasons discussed above. *See Tejwani*, 2009 WL 860064, at *4 n.* (dismissing plaintiff's Title VI claim along with his Section 1981 claim because the "claim under Title VI also requires a showing of intentional discrimination"); *see also N.Y. Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995) ("[T]he Supreme Court [has] held that [42 U.S.C. § 2000d] only prohibits *intentional*

discrimination, not actions that have a disparate impact upon minorities.") (citing *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 610-11 (1983)).

Plaintiff's Title VI claim also fails for the separate and independent reason that he has failed to allege—let alone establish—that there is a "nexus" between any "federally funded program or activity and the alleged discrimination." *See Shin*, 2017 WL 3316129, at *2 (citations omitted). As the Delta Defendants point out, Plaintiff has made "no mention of any alleged federal assistance program that could possibly satisfy this requirement." Delta Mot. at 17. Indeed, Plaintiff indicated at his deposition that he is not aware of any program by which Delta receives federal funds, as is required under Title VI. *See* Pl. Tr. at 97. Plaintiff's failure to establish that Delta receives the necessary federal funding is fatal to his Title VI claim. *See McCrudden v. E-Trade Fin. Corp.*, No. 13-cv-8837, 2014 WL 3952903, at *3-4 (S.D.N.Y. Aug. 12, 2014); *Bary*, 2009 WL 3260499, at *7; *Shin*, 2017 WL 3316129, at *2. The Court thus grants the Delta Defendants' motion for summary judgment as to Plaintiff's Title VI claim.

## II.     Excessive Force Claim Against the Port Authority

Plaintiff also brings a claim for excessive force against the Port Authority. In his complaint, he alleges that, based on the Delta Defendants' allegedly "racist and defamatory statements and conduct," he was "illegally stopped" and "wrongfully detained" by the Port Authority officers. Compl. ¶¶ 5-6; *see also id.* ¶ 57 (alleging that the "force used by the Port Authority of New York/New Jersey police was excessive, unnecessary and unreasonable"). In particular, Plaintiff alleges that there was an "overwhelming show of force by about four or five Port of New York/Jersey police officers" when the officers entered the aircraft upon landing at LaGuardia, and that this "show of force" "exacerbated [his] already existing precarious mental condition," and caused him "further anguish, mental pain/anxiety, humiliation and

embarrassment," which "resulted in uncontrollable tears in the terminal." *Id.* ¶ 52.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

The Port Authority is treated as a municipality for purposes of a Section 1983 claim. *See Belpasso v. Port Auth. of N.Y. & N.J.*, No. 07 Civ. 3627 (SHS) (DF), 2009 WL 10703182, at *10 (S.D.N.Y. Sept. 17, 2009) ("This Court has consistently held that the Port Authority qualifies as a 'person' for purposes of establishing liability under Section 1983, and that the scope of the Port Authority's liability thereunder should be analyzed under the standards governing municipal liability.") (citations and alteration omitted); *Mack v. Port Auth. of N.Y. & N.J.*, 225 F. Supp. 2d 376, 382 n.7 (S.D.N.Y. 2002) ("Although the Port Authority, a bi-state agency, is not technically a municipality, courts have treated it as such and have analyzed claims against it under the standards governing municipal liability under Section 1983.") (collecting cases); *see also Turturro v. Continental Airlines*, 334 F. Supp. 2d 383, 392 (S.D.N.Y. 2004) (noting that, when the Port Authority's "agents act in a law enforcement capacity, they act under 'color of law'") (citing *Raysor v. Port Auth. of N.Y. & N.J.*, 768 F.2d 34, 40 (2d Cir. 1985)).

To state a claim for municipal liability under Section 1983, a plaintiff must allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Khalil v. City of New York*, No. 17-CV-1729 (JFB) (SIL), 2018 WL 4658803, at *8 (E.D.N.Y. June 11, 2018) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010)). "Thus, to recover against the Port Authority under Section 1983, [Plaintiff] must

establish that the alleged deprivation of his rights was caused by the execution of an official policy or custom of the Port Authority." *Belpasso*, 2009 WL 10703182, at *10 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-95 (1978)).[14]

The Port Authority argues that Plaintiff's Section 1983 claim fails because Plaintiff has not adduced or even alleged evidence as to "whether and which policy or custom caused any alleged unconstitutional conduct," and "the absence of any allegation or proof that a Port Authority policy or custom caused the constitutional deprivation of Plaintiff's constitutional rights is fatal" to his Section 1983 claim. PA Mot. at 5-6. The Court agrees. At the very least, Plaintiff "must demonstrate facts 'tending to support, at least circumstantially, an inference that such a municipal policy or custom exists.'" *Nguedi*, 2018 WL 4636837, at *4 (citation omitted). Here, however, Plaintiff does not point to any "policy or custom" of the Port Authority that "led to the alleged use of excessive force." PA Mot. at 5. Not only is his complaint devoid of any allegation of any such Port Authority policy or custom, Plaintiff admitted in his deposition that he is not aware of any Port Authority custom to use excessive force when responding to calls from airlines. *See* Pl. Tr. at 212-213.

Furthermore, even if Plaintiff were able to point to a policy or custom, his excessive force claim would still fail. "[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S.

---

[14] The Port Authority cannot be held liable under Section 1983 based on a theory of *respondeat superior* or vicarious liability. *See Nguedi v. City of New York*, No. 16-CV-4430 (RA), 2018 WL 4636837, at *4 (S.D.N.Y. Sept. 27, 2018) ("[I]t is well-established that municipalities cannot be liable merely because they employ a tortfeasor.") (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997)); *Khalil*, 2018 WL 4658803, at *8 ("A municipality may not be held liable under Section 1983 on a *respondeat superior* theory.") (citing *Monell*, 436 U.S. at 690-91); *Belpasso*, 2009 WL 10703182, at *10 ("Where the alleged deprivation of rights is caused by isolated, individual conduct, . . . a Section 1983 claim cannot stand.") (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992)).

386, 395 (1989).[15] "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (quoting *Graham*, 490 U.S. at 397). Plaintiff has provided no evidence to support the inference that any of the Port Authority officers acted unreasonably or that any of their actions could be characterized as "excessive," "improper," or "unreasonable."

Plaintiff's own deposition testimony confirms that his excessive force claim cannot survive. According to Plaintiff, merely being asked to get off the plane by numerous officers was an unreasonable, illegal "show of force." Pl. Tr. at 165; *see also id.* at 181 ("I believe the sheer number of policemen coming on the plane was excessive."); *id.* at 194-195 (indicating that the entirety of the harm done to him was that the officers entered the plane and escorted him off). From Plaintiff's perspective, if even only one officer had boarded the aircraft to escort him off, that action would necessarily have constituted excessive force in violation of his constitutional rights. *See id.* at 181. Plaintiff cites no facts or legal authority in support of this position, and the Court is aware of none.

In reality, Plaintiff's testimony demonstrates that the Port Authority's actions were far from "excessive" or "unreasonable." Indeed, Plaintiff describes the officer who approached him on the plane as "polite," and the officers in general as "cool." *Id.* at 162. None of the officers had their weapons drawn or were carrying anything in their hands, such as a flashlight or baton, when they

---

[15] When pressed during his deposition as to what right was violated by the Port Authority's alleged use of excessive force, Plaintiff responded, "Well, I guess it could be the Fourth Amendment, . . . not so much the search but the seizure. That's what I could think of offhand." Pl. Tr. at 204. Plaintiff does not, however, allege or set forth any evidence even indicating that he was "seized" within the meaning of the Fourth Amendment. *See Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994). Nor does Plaintiff establish an excessive force claim under the Fourteenth Amendment. *See Abujayyab v. City of New York*, No. 15 Civ. 10080 (NRB), 2018 WL 3978122, at *5-6 (S.D.N.Y. Aug. 20, 2018) (citing *Edrei v. Maguire*, 892 F.3d 525, 537-38 (2d Cir. 2018)).

entered the aircraft. *Id.* at 164-165. Moreover, Plaintiff acknowledged that none of the officers touched him as he was exiting the plane, and he described his harm as "more psychological than physical." *Id.* at 167. Plaintiff also admitted that, once they were off the aircraft, none of the officers yelled at him or threatened him in any way, and none of the officers either touched him or placed him in handcuffs. *Id.* at 174. Plaintiff explicitly testified that he "didn't feel intimidated by the police" when he was being interviewed, *id.* at 178, and that he did not feel restrained by the officers at any point, *id.* at 179. As to the officer who interviewed him in the terminal, Plaintiff testified that that officer "wasn't adversarial," but rather, was respectful and cordial. *See id.* at 169-170, 179. In sum, the record shows that no excessive force—in fact, any force—was used on Plaintiff. Accordingly, the Port Authority is entitled to summary judgment on Plaintiff's excessive force claim.

### III. State Law Claims

Finally, Plaintiff asserts claims for discrimination under Section 40 of the New York Civil Rights Law, defamation, and intentional infliction of emotional distress. The Court declines to exercise supplemental jurisdiction over these remaining claims.

A district court may, at its discretion, "decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see Lopez v. N.Y.C. Dep't of Educ.*, No. 17-CV-9205 (RA), 2019 WL 2647994, at *3 (S.D.N.Y. June 26, 2019) ("Generally speaking, courts decline to exercise supplemental jurisdiction over state-law claims once all federal claims in a case are dismissed."). When a plaintiff's federal claims are dismissed before trial, including on a motion for summary judgment, it is often appropriate to dismiss the state claims as well. *See Morton v. Cty. of Erie*, No. 18-3085-cv, 2019 WL 6910459, at *3 (2d Cir. Dec. 19, 2019) (finding "no error in the court's decision to decline to exercise

supplemental jurisdiction" after granting summary judgment to defendant on the federal claims); *Francis v. Chem. Banking Corp.*, 213 F.3d 626 (2d Cir. 2000) ("Because all of the plaintiff's federal claims were properly dismissed [on summary judgment], the district court did not abuse its discretion in declining to exercise supplemental jurisdiction."); *Nguedi*, 2018 WL 4636837, at *7 (granting defendants' motions for summary judgment on plaintiff's federal clams and declining to exercise supplemental jurisdiction over plaintiff's state law claims). Having dismissed Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over his remaining state law claims.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are granted. The Clerk of Court is respectfully directed to enter judgment in favor of Defendants, terminate the motions pending at Dkts. 111 and 117, and mail a copy of this Order to Plaintiff.

Because the Port Authority has also filed a cross-claim in this action against Delta, which Delta answered, those parties shall jointly file a letter within two weeks of this Opinion, updating the Court as to the status of the cross-claim and whether any further action from the Court on that claim is sought.

SO ORDERED.

Dated:    January 22, 2020
         New York, New York

Ronnie Abrams
United States District Judge